Good morning, your honors, and may it please the court. I'm David Becker here on behalf of Appellant Western Watersheds Project. With me at council table is Kristen Ruther. I'm going to try to reserve five minutes of time, and I'll keep my eye on the clock for rebuttal. The Forest Service added the InFISH Inland Fish Strategy to the Forest Plan for the Chalice National Forest more than 20 years ago in response to degraded stream conditions. The InFISH standards and riparian management objectives are intended to promote recovery of degraded stream habitat for inland fish like the endemic population of mountain whitefish in the unique Big Lost River Basin of Idaho. Livestock grazing was one of the main causes of degraded stream conditions that led the Forest Service to adopt InFISH, and therefore Forest Plan standard GM-1 requires the Forest Service to modify grazing practices that retard or prevent attainment of riparian management objectives, which are the measurable attributes of good fish habitat, namely cold water temperature, high pool frequency, stable and overhanging banks, and narrow deep stream channels. Now this case is important because if the Forest Service is not held to the requirements of National Forest Management Act consistency when it issues annual operating instructions, then none of its grazing decisions in Copper Basin will be subject to Forest Plan standards. The Forest Service has not prepared an allotment management plan since before InFISH was adopted since 1992, and none of the permits that are in the record or the supplemental excerpts of record demonstrate that consistency was done at that point. And here the Forest Service violated the plain language of the National Forest Management Act, which provides that each instrument for the use and occupancy of the forest shall be consistent with the Forest Plan, because the agency didn't follow the process that this Court's case law requires for showing consistency with Forest Plan standards. Namely, the agency action has to be analyzed for Forest Plan consistency. The analysis must show that that activity is consistent with the Forest Plan, and the agency has to articulate and document in the administrative record that the activity that it's proposing is consistent. Now annual operating instructions in this case are instruments for use of the forest, and this Court has held in the Buckingham case and in the Oregon Natural Desert Association case that annual operating instructions must be consistent with the Forest Plan. In fact, the Oregon Natural Desert Association case emphasized that the annual operating instructions are a, quote, critical instrument in the Forest Service's regulation of grazing. That's at 456 F. 3rd at 984. And as this Court recognized at page 981 of that same decision, annual operating instructions set the stocking levels and the pasture rotations in response to that year's condition. And therefore, they're the most important decision point for ensuring that the proposed grazing for that year is consistent with Forest Plan standards. Here the Forest Service violated NFMA because there's no evidence in the administrative record that's contemporaneous with the 2015 grazing decisions, with the 2015 annual operating instructions, that demonstrates that the agency actually analyzed and determined that the proposed levels of grazing were going to be consistent with grazing standard GM1. The district court looked at the 50,000-page record and has told us that based on its review of the record, the 2015 AOIs were consistent with the Forest Plan and did that with a view not only to the affidavits, which I know you challenged, but with all of the various reports, including the monitoring reports, the end-of-season reports, the other monitoring and the like, and said with a healthy measure of deference to the Forest Service, the AOIs were consistent. So what specifically was wrong with that conclusion? Two points, Your Honor. First, this Court's case law says that there has to be a contemporaneous consistency analysis, and there's no consistency analysis. Of course not with respect to the AOIs themselves. There's nothing specific on the AOIs in our case law. And the second point is that... Was that a yes? There's nothing specific to the AOIs, so there's nothing in the record that the agency has said that the amount of grazing they're proposing for 2015 is going to be consistent. It's not going to retard or prevent attainment of the riparian management. The opposing counsel, I think in their brief cites Alaska v. D.C., a Supreme Court case saying a skeletal order is acceptable as long as, when read with the rest of the record, you can reasonably discern the agency's pathway. And that seems to be what the district court was saying here. So why is that wrong? There's nothing in the various points in the administrative record that the district court and that the Forest Service has pointed to that this Court can defer to. Because there's nothing that relates the vegetation monitoring that the agency is relying on and saying now in their briefing and in trying to make their arguments and in the extra record declaration of Ranger Weaver, there's nothing that ties the vegetation monitoring that they do to the trends in the riparian management objectives that this Court can actually defer to. There's simply a series of assumptions that are not supported by substantial evidence and that, in fact, are inconsistent with the facts on the ground here, which show that there is no recovery in riparian management objectives. The district court looked at Western Watersheds Project's evidence and said it's isolated incidents, it's not substantial evidence undermining the Forest Service's determination. And so it looked at each of the specific incidents that Western Watersheds identified and said that's not enough to undermine the deference we owe to the Forest Service's overall view of whether grazing was causing a retardation of the RMOs. So you're now saying again that Western Watersheds' evidence was sufficient. Why was the district court wrong on that? There are a couple of different parts to that question, I think. And I would step back and say that under the way this Court interprets the National Forest Management Act, it's the agency that has to show that, in this case, grazing is not retarding or preventing attainment of the riparian management objectives. And the way that they've tried to do it in this case is by pointing to basically three different places in the administrative record that they say they make this connection between the vegetation monitoring, that they claim that desired vegetation conditions are more or less being met, and the riparian management objectives, which are the indicators of actual fish habitat in the streams. They do this through the declaration of Ranger Weaver, which is at ER 111, where she says that if desired vegetation conditions are being met, then it is reasonable to assume that grazing management has not prevented attainment of the riparian management objectives. But her assumption that it isn't based on any data, it's not based on any connection or study that has shown that attaining vegetation standards somehow equates to not retarding the riparian management objectives. It's contrary to the district court, because the district court said the affidavits are just condensing and explaining what's already in the record based on its review of the record. And I think that largely that is true, but that particular statement by Judge Weaver is an opinion statement. It's not something that is backed up by anything that's in the record. So NFISH itself says this determination about retarding the attainment of the RMOs is a matter of professional judgment. So basically you're saying the Ranger Weaver was articulating professional judgment on this point. So what's wrong with that in light of NFISH's guidance on what retarding the attainment of the RMOs means? Because this court still holds that when an agency is exercising its professional judgment, it has to be doing so on the basis of studies that it has determined are reliable and that the conclusion that it's drawn from whatever methodology have to be explained in the record. That's the lesson of Lands Council v. McNair. And neither Ranger Weaver nor the guidance documents themselves point to anything that connects a trend in vegetation to the riparian management objectives. It's really all assumptions. Judge Weaver's assumption, the assumptions going back through the 2008 riparian strategy to ER 541, back to the 1995 guidance document, which at ER 614, under the heading key assumptions, says that we believe that natural rates of recovery can be provided if we limit environmental effects to those that don't carry over to the following year. The same guidance document at ER 617 goes on to say that that assumption that there won't be carryover effects and therefore there will be riparian recovery depends on implementing certain very stringent triggers. For example, no more than 30 percent woody browse on the vegetation, no more than five percent. I'm at the Enclosure B guidance document. So the argument that, well, the district court states and the argument that's made by the other side is that that is non-binding guidance that gives some general principles that are not even specifically directed towards this forest. It's part of the pack fish, in fish, biological opinion guidance document. So something that can be considered by the Forest Service, but certainly not binding. That's the argument that's made. But the Forest Service is trying to have it both ways. They're trying to say that the conclusion or the assumption that grazing effects will not carry over and therefore there will be recovery depends on these very definite triggers that are specified at 617 of the excerpts of record. No more than 30 percent woody browse, no more than five percent bank alteration. On the Salmon Chalice National Forest, they're allowing up to 50 percent browse, nearly twice as much vegetation browse as the Forest Service guidance document says has to be limited to in order to benefit from that assumption. So the grazing that's being allowed on Copper Basin can't take the benefit of that assumption that there won't be carryover effects. And any assumption that you're saying that their determination that grazing is not retarding or preventing a team of riparian management objectives is based solely on enclosure B, because I didn't see that in the record. It's based on enclosure B, it's based on the Forest Service several times in their brief site ranger weavers declaration, and it's based on the 2008 riparian strategy. It's also based on end of season reports and their methods for evaluating attainment of RMOs, including their monitoring during the season. They seem to present a wide range of information, at least that was the district court's view. But nothing in that information ties the vegetation monitoring to whether or not riparian management objectives are being obtained. That's not what they have to show. They have to show that grazing, in their professional judgment, is not retarding attainment. There may be other things that are affecting RMOs, which are broad benchmarks, but the question is whether it's the grazing that's causing that. But if they don't have a link that shows that the vegetation monitoring relates to the riparian management objectives, and in this case, the data for the riparian management objectives shows that instead of recovery over time, there has been static conditions, or even in some cases, getting slightly worse. The data is in the record at ER 178 to 184, and the summary table of that data that appears at ER 208 shows that, for example, bank stability over time has decreased from 71% to 63%. The percentage of pools has dropped. And this court in Native Ecosystems Council v. Tidwell, Native Ecosystems Council v. U.S. Forest Service, has said that when an agency relies on an assumption, and that assumption does not mirror reality, and in this case, they're making the assumption that if vegetation monitoring is all okay, then riparian management objectives are not going to be retarded. By the grazing, is what you're saying. Are you saying that we would need to evaluate the scientific data in the record? There is no scientific data in the record with respect to this linkage between the vegetation monitoring... But there's the evidence of their monitoring and the results that they have and the conclusions they draw from their end-of-season reports and the like. But none of that, there's nothing in any of those end-of-season reports makes a single mention of riparian management objectives. And is that necessary, or do we take their professional judgment? The professional judgment has to be based on a factual linkage between... What they're monitoring for is vegetation that the cows eat. What the standard GM1 instructs them to look at is riparian management objectives. So they have to draw that connection with reliable science or some study that shows that if vegetation is okay, then riparian management objectives are going to be attained or moved to at a near natural rate. Because there's nothing like that in the record, and because the actual facts on the ground show that there isn't any recovery. And in fact, at ER 197... Do you mean to be saying, right, the actual facts on the ground show there isn't recovery in vegetation? In the riparian management objectives, yeah, because the riparian management objective data show that for many of the riparian... There's considerable data that the Forest Service cites, too, about recovery of vegetation. You just think that there isn't a causal connection, or they haven't shown a causal connection. They simply make assumptions, and this court has said that when there is an assumption that is not supported, that does not mirror reality, it's a violation of the National Forest Management Act to rely on that assumption. Just very quickly on the sediment standard, I think it's even more clear that there was no analysis done contemporaneous with the 2015 grazing decisions, despite the fact that in four different places on these... Five different places on these four allotments, there was sediment in excess of 30%. And the unambiguous line... Sorry, but you're running out of time, and I'm just really trying to get one question in between. You did turn to sediment, and the way I read your record, or your briefing, seemed to suggest that you think sediment should be measured much more frequently. Not that it should be measured much more frequently, but that each year, when issuing an annual operating instruction and saying that a certain number of cows are going to go out to certain areas for certain periods of time, they have to explain why that is consistent with the standard and... Again, you're running out of time, so my question is, is it your position that needs to be done annually before each grazing permit is issued? They don't have to measure sediment, but they have to explain if the sediment levels are over 30%, what they're going to do to keep it lower. Not necessarily an... They're measuring sediment almost every year. That's in the administrative record. My question is just whether you think they need to do that every year before issuing the... So the language of the standard is that activities that are contributing sediment  if these levels are exceeded. And the Forest Service says that they are not, based on their holistic look at the streams. You've made five different specific points, but they say that's not what the standard requires. That's not articulated in the administrative record, anyway. I'm just trying to get your position, given that we're talking about a really vast area. Our position is that there has to be at least one sentence of rational connection made at the time of the annual operating instruction each year that says, this amount of grazing is not going to cause sediment to exceed 30%, or we're reducing it so that sediment levels come down below that threshold. I'll reserve my time. Thanks. Good morning. May it please the Court. My name is Erica Kranz. I'm representing the Forest Service. This case is about a tool that the Forest Service uses to implement grazing. And grazing is, of course, a use that is envisioned by the Multiple Use Sustained Yield Act. It's envisioned by the forest plan that applies to these allotments. It's envisioned by the allotment management plans that apply these allotments. And it's authorized by the term permits that are issued on these allotments. I don't think that's contested, but I read his briefing to say that year after year, the very same grazing permits are being issued, and that there hasn't been a showing that this practice is not retarding the attainment of the riparian management objectives, or maybe even that you're backsliding, whether it's static or backsliding. So what is your response to this? So first, I think you are referring to the annual operating instructions, right, instead of the permits. The permits are issued in 10-year terms. The annual operating instructions are optional, but the forest does... You're using them. You're implementing that practice. That's right. But just to be clear, grazing could proceed under the permits alone at those authorized levels. The annual operating instructions are just fine-grained instructions that are used to reduce grazing below those levels at the Forest Service's discretion. But can you go to his point, please? Yes, of course. So one important thing I want to point to is, over and over again, we've heard them say that there's no connection between the vegetation, the attention to the vegetation consumption, and the attainment of RMOs. The NFISH implementation package that was issued soon after the Forest Service basically instructed itself on how to implement NFISH says, the recovery of the vegetation component of the riparian system will be used to predict whether grazing will ultimately degrade or prevent the attainment of RMOs. That's the connection. From the very beginning, that is how the Forest Service said it's going to comply... But I didn't hear him challenge that. What I hear him challenge is something different. What he's saying is it's based on an assumption. Could you go to his point, please? That's not an assumption, though, right? This is the direction that the Forest Service gave about how it's going to manage grazing to prevent... That's just a different point, and I'm not trying to split hairs, but he is making a different point. Well, I guess it's just not an assumption. I mean, if you look at the riparian strategy, it's this entire strategy that talks about why it makes sense to pay attention to vegetative conditions in trying to manage grazing for attainment of RMOs. It's because those vegetative conditions and the stream bank's stability, those are the things that grazing directly impacts. There may be indirect impacts on other RMOs, but those are the ways that grazing directly impacts the riparian system. I'm not trying to take his side, and I'm not trying to be adverse to you. What would be helpful to me, because you're making a point that seems to me to be very intuitive, would be if you could point to a place in the record. His contention that the Forest Service is relying on assumption, that's what would be helpful to me. The riparian strategy, it begins at ER 536. I think the critical part for you is 541, 542.3, talks about how they're going to manage grazing so that it will allow riparian recovery. The Forest Service, this is, again, an extension of NFISH itself. That language I just read to you was from SER 878. The Forest Service is then applying that. The strategy says we're going to focus on these direct impacts of grazing, and if we can manage so that we're moving towards these healthy vegetative communities, that means that grazing should not be preventing attainment of RMOs. So what you see in the record is the Forest Service monitoring for the health of the riparian system. So you see the green line monitoring, you see the bank stability monitoring, and then you see the Forest Service responding to that. So what you're telling me is that there's evidence in the record, and I think there's quite a lot of evidence in the record, that the Forest Service is implementing that plan. That's right. I think a good place to look is the, because the lawsuit here is focused on the 2015 AOIs. I think a good place to look is at the 2015 AOI for Boone Creek and the corresponding 2014 end-of-season report that sort of led to the 2015 AOI. That's at ER 230. So the Forest Service does this green line monitoring about every five years, and we have four allotments here. They happen to do the green line monitoring for Boone Creek in 2014. So in the 2014 end-of-season report, you see the results of that monitoring. In the 2015 AOI for Boone Creek, you again see a summary of the results of that monitoring. In the results, you see the agency explains that it appears from the data that the ecological status of one of the four monitoring sites has declined from a late-seral status, which is a good thing, to a mid-seral status, slightly less good. The agency, you see them looking at it critically, saying, we actually don't think that probably reflects reality. We've looked at the photos. This looks like a healthy stream. We think probably the data was flawed because there was a misidentification of grasses. Let's remonitor it. If we see that, indeed, the serial status has declined, we will change our grazing management for this allotment. It all goes to the health and vitality of the vegetation, right? That's right. And so that's kind of my point. And again, I don't mean to beat a dead horse, but I think that's his point that he's arguing, that it's based on an assumption, the Forest Service is operating on an assumption that the vitality and health of the recovery of the vegetation is going to cause the attainment of the RMOs. He's asking for the basis for that. The basis for that is set out in the riparian strategy. It says livestock grazing indirectly impacts most of these attributes, which is essentially the RMOs, through direct impacts to greenline successional status, bank stability, and woody species regeneration. And those are the things that the Forest Service is doing this periodic monitoring for. And again, this extends from in the fish itself, which is, of course, the source of GM1 that we're all talking about. On Boone Creek, I know this is post-decisional, but we're here several years later, what you can actually see after the data that's in this record is the Forest Service did go back and remonitor. And guess what? They concluded that they'd been correct, that that site actually had not declined to a mid-serial status. It was now a potential natural community, which is the highest quality vegetation, and it was doing quite well. You can also see that the way the Forest Service is doing this is having good results. I think a nice place to look starts at SCR 761. There's a document, and I think it's a PowerPoint presentation that walks through several basically case studies of sites on these allotments. It shows the trends in the greenline data. It describes the improvements to the habitat, not just to the vegetation, but to the fish habitat more generally. There are lots of photographs that bear it out. You can see the quality of the habitat improving, and then there's a nice narrative explanation summary of what's going on on these allotments. I think that's helpful. I mean, it shows that the Forest Service is not just gathering this data, it's compiling it, it's thinking about it, it's judging whether grazing is allowing riparian recovery. And in that document, you see them drawing the conclusion that the way that they are managing grazing on these allotments is absolutely allowing riparian recovery, and that is, after all, the goal that we're all talking about. The plan here is very focused on the RMOs themselves and the non-attainment of RMOs, but as we set forth in our brief, the non-attainment of RMOs is not all that GM1 is about. It's about causation, as we've been discussing. The fact that you're not meeting RMOs on these allotments doesn't automatically mean that grazing is causing or slowing attainment. We see non-attainment of RMOs on unmanaged sites in the same area, and unmanaged or reference means these sites that are essentially free of human and grazing and other impacts from management activities. So it's not reasonable to expect that you would have all RMOs be attained on these areas, because other essentially pristine parts of this forest are also not meeting those RMOs. There are lots of other management activities that can contribute to pressure on these riparian systems. We have roads in the areas. We have human activities like camping, hiking, other dispersed recreation. And so I do caution you to draw a conclusion simply from the fact that these allotment sites are not meeting all RMOs. There's also nothing in the forest plan that requires this kind of contemporary analysis each time the Forest Service issues one of these AOIs. I mean, these AOIs are intentionally brief documents. We're talking about just four allotments here, but there are over 100 grazing allotments on this forest, and the forest is typically issuing AOIs for all of them every year. So they're spread pretty thin. These are documents that are essentially a communication between the forest and the grazers. They're reiterating instructions about ways to comply with their permit, remedy past violations, and, of course, the sequence of rotation through these different grazing units. There's nothing that requires this type of analysis or really legal conclusion in this document, and that's just not the way that the Forest Service is managing this. Instead, it's developed a strategy ahead of time, and it's implementing it. Now, on to sediments, briefly, there's, again, nothing that requires the Forest Service to make these adjustments on an annual basis to its grazing program, simply because there's been one measurement at one location that is above 30 percent. I think the agency is relying on science that says measuring sediments and establishing a baseline and trends is a lot more complicated than that, and that's due deference. And on the declarations, we've relied on well-established exceptions to the record rule that allows courts to rely on, agency declarations that explain the record. We think the agency's path is discernible here without the declarations, but I do think they're helpful because they can help you connect the dots in what is obviously a... Did they offer anything new? I don't think they offer anything new, really. I think the Weaver Declaration in particular is helpful, sort of explaining the broad program, how you're going from in fish to the strategy to the implementation, and then summarizing the results. I think that's awfully helpful in a case like this where you have such a voluminous record with a lot of just data in it. That can be hard for non-scientists, non-land managers like me to interpret, but I don't think that you need them, the declarations. If there are no further questions... Apparently not. Thanks. We ask that you affirm the district court's decision that the agency did not violate NIFMA in issuing these annual operating instructions. We have some time for rebuttal. Thank you, Your Honors. Judge Christin is right. There is nothing in the 2008 riparian strategy at ER 541 that connects the vegetation monitoring that they're doing to the attainment or non-attainment of the riparian management objectives. That wasn't a statement on my part. It was a question, and I am looking for it, and I've been looking for it. But what's your strongest support for the argument that you really have to have that? I think the Native Ecosystems Council cases. That's what you rely on? NECV Tidwell, NECV U.S. Forest Service that says if you make this sort of assumption that doing one sort of monitoring is going to equate to telling you something about the actual forest plan standard, if the assumption that you make that they're connected is belied by the actual riparian management objectives that the standard GM 1 directs the Forest Service to manage for, then it's a violation of NFMA to rely on that assumption. So by belied, what you mean is if the RMOs are not improving or the attainment of the RMOs is not improving, then we have to look backwards and say that must be because there's something about the grazing causing them. Is that what you're saying? I'm not saying that there's a record as intensive in this area. Is that a guess? Because that's an important question to me. It is. ER 820 says that grazing is intensive. NFISH at ER 715 says that this sort of heavy livestock is... You're answering a different question, not from the one that Judge Okuda... is belied by the RMOs, and I'm asking you if that means... But what you mean by that is if attainment of the RMOs is not improving, that must mean that the grazing process is... There's something wrong with that. That's causing a problem. We can reason backwards. In this case, I think you can, because grazing is the only intensive activity. But the standard GM-1 tells the Forest Service that it needs to look at that grazing when there's not attainment or not even... Where there hasn't been any upward trend for 20 years, there's something that's retarding that attainment of RMOs, and the agency has to look at, when they decide, how many cows to send out where in a given year. They have to do the consistency analysis to determine, is the grazing, which is the only intensive activity documented in this record, retarding the attainment of the riparian... Thank you very much. Any other questions? Thank you.
judges: Ikuta, Christen, Freudenthal